## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF NEBRASKA

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE ) | |
| CORPORATION as Receiver for ) | |
| Mid City Bank, Inc. ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. |
| vs. ) | |
| ) | |
| JAMES G. FITL ) | **JURY DEMANDED** |
| ) | |
| Defendant. ) | |

### COMPLAINT

Plaintiff the Federal Deposit Insurance Corporation as Receiver for Mid City Bank, Inc.

("FDIC-R") for its Complaint against Defendant James G. Fitl ("Defendant") states as follows:

### INTRODUCTION

1.      The FDIC-R brings this action in its capacity as Receiver for Mid City Bank, Inc.

("MCB" or the "Bank") pursuant to its authority granted by 12 U.S.C. § 1821.  The Defendant –

the former President and Chairman of the Board of Directors of the Bank – was grossly negligent

and breached his fiduciary duties when he disregarded the Bank's loan policy and prudent

lending practices in approving at least 12 commercial loans ("CL") and 5 commercial real estate

("CRE") loans made between July 2007 and March 2010 (collectively, the "Target Loans").

2.      In this lawsuit, the FDIC-R seeks to collect damages flowing from Defendant's

gross negligence and breaches of fiduciary duty, in an amount not less than $4.018 million.

## PARTIES

**Plaintiff**

3.      The FDIC-R is a corporation organized and existing under the laws of the United States of America.  12 U.S.C. § 1811, *et seq.*  The FDIC-R was appointed as Receiver for MCB by the Nebraska Department of Banking and Finance on November 4, 2011, the same day the Bank was closed.  Pursuant to 12 U.S.C. § 1821(d)(2)(A)(i), the FDIC-R succeeded to all rights, titles, powers, and privileges of MCB and MCB's shareholders, accountholders, and depositors, including, but not limited to, MCB's claims against the Bank's former directors and officers as set forth herein.

**Defendant**

4.      Defendant was President of the Bank from August 16, 1971, to September 15, 2010, and Chairman of the Board from March 6, 1972 to October 8, 2010.  He resides in Nebraska.

## JURISDICTION AND VENUE

5.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345.

6.      The Court has personal jurisdiction over Defendant pursuant to Neb. Rev. Stat. § 25-536 because at all relevant times, Fitl was a resident of and/or transacted the business of MCB in Nebraska.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the FDIC-R's claims occurred in this judicial district.

## FACTUAL BACKGROUND

**Bank History**

8.      MCB was established in 1965 with its main office in Omaha, Nebraska, and four branch offices also located in Omaha.   MCB provided a wide range of financial services, including commercial, consumer and mortgage loans, business and personal transaction accounts, letters of credit, and online banking.

9.      MCB was a wholly owned subsidiary of a single-bank holding company, 304 Corporation ("304").  Defendant owned 33.54% of the stock in 304.

10.     MCB was dominated by Defendant, who served as President and Chairman of the Board for nearly four decades.  The Bank operated according to his dictates, and each of the loans at issue here was made with his full knowledge and his direct approval.

**MCB's Loan Policy**

11.     Prior to August 13, 2009, the Bank operated under versions of the Bank's lending policy (collectively, "Loan Policy"), which did not provide any practical guidance for the Bank's lending activities.  The Loan Policy did not address specific processes required for (i) approval, funding, and file documentation for loans; (ii) control and oversight mechanisms, including review of loans; or (iii) risk management tools.  Rather, loan officers were given vague and subjective goals, such as having "an accurate and thorough understanding of each customer's financial needs and conditions" or "having complete confidence in the borrower's honesty and integrity, and reasonable confidence in his ability to repay."

12.     Before August 2009, the Loan Policy listed certain general factors to consider, such as the borrower's financial condition, management capability, plan of repayment, and the economic environment, but it did not include any guidance or limits on key metrics such as debt

to income ("DTI") ratio or minimum credit scores.  In fact, some versions of the Loan Policy did not even include loan to value ("LTV") ratio limits.

13.     It was not until August 2009 that the Loan Policy was revised to require that a complete credit file be maintained on each borrower to support credit decisions, such as collateral valuations and borrower financial information.  Prior to this revision, the Bank's loan documentation was nearly nonexistent.

14.     For years the Bank had no written policy setting loan approval authority for Bank management and almost no objective criteria to guide lending decisions.  The Loan Policy lacked any concrete dollar amounts or guidance on the loan approval authority of the President, directors, or loan officers.  Prior to August 2009, the Bank operated without a Loan Committee to review and approve loans.

## TARGET LOANS

15.     The $4.018 million damage claim is based on losses from 17 loans approved from July 6, 2007 through March 8, 2010 ("Target Loans").  Defendant approved these loans in violation of MCB's loan policies, underwriting requirements, and sound and prudent lending practices.  As detailed below, each Target Loan exhibited one or more of the following deficiencies: (i) failing to analyze the borrowers' and guarantors' ability to repay loans; (ii) lending to borrowers with inadequate cash flow; (iii) relying on outdated, unverified, and inadequate financial information for borrowers and guarantors; (iv) failing to analyze the value of collateral; (v) failing to require adequate collateral for loans; (vi) failing to acquire adequate appraisals;  and (vii) lending outside of the Bank's trade market area.

16.     Defendant repeatedly ignored the Bank's written Loan Policy requirements throughout the time period at issue.  Defendant also repeatedly failed to undertake the analysis

4

necessary to evaluate the Target Loans and approved them without sufficiently informing himself of information necessary to evaluate them fully.

17.     Defendant also approved loans orally and without documentation.  Prior to 2010, no standard credit or loan memoranda were created for loans.

18.     The loan files and approval processes for all of the loans were deficient in numerous respects, as described in the following paragraphs, but Defendant approved the Target Loans despite these deficiencies.

**Loans to Borrower A, Shafer Commercial, and Midwest Muffler**

19.     Borrower A was a real estate developer, used car salesman, and owner of an auto repair business.  (The names of the individual borrowers and guarantors are not included herein to protect their privacy. The names of these borrowers and guarantors will be provided to the Defendant.)  He secured loans from MCB in his own name as well as in the name of his businesses, including Shafer Commercial Properties, LLC ("Shafer Commercial") and Midwest Muffler & Exhaust Inc. ("Midwest Muffler").

**Loan  I to Borrower A and Shafer Commercial**

20.     On April 10, 2008, Defendant approved a $1.4 million loan to Borrower A and Shafer Commercial to refinance a $1.1 million land development loan that the borrowers had with another bank and to provide the borrowers with additional cash for property development on another project and other expenses (the "Borrower A Loan I").  The loan was secured by a Deed of Trust on a 66 acre parcel of undeveloped land owned by Borrower A in Grand Island, Nebraska (the "Property") and a second lien on Borrower A's home.

21.     The one page loan request form completed by Defendant identified the primary repayment source as the "property" and the secondary repayment source as Borrower A.

22.     On April 2, 2009, Defendant approved an extension and increase of the Borrower A Loan I to a total loan amount of $1,797,193.12.  The purpose of the increase was to refinance the $1.4 million loan and provide the borrowers with additional cash to cover losses suffered after the sale of one of the borrowers' other properties.  The loan was again secured by a Deed of Trust on the Property and a second lien on Borrower A's home.  The repayment sources were identified as the Property and Borrower A.

23.     Defendant's approval of the Borrower A Loan I violated the Bank's Loan Policy and safe and sound banking practices, and demonstrated an absence of even slight care in several respects, including, but not limited to, the following:

a.     Defendant failed to investigate the borrowers' payment history with the prior lender.

b.     Defendant failed to analyze Borrower A and Shafer Commercial's ability to repay the loan.

c.     Defendant failed to obtain tax returns and financial statements for Borrower A or Shafer Commercial.

d.     Defendant failed to obtain a credit report for Borrower A.

e.     Defendant failed to perform or require a global cash flow analysis for Borrower A or Shafer Commercial.

f.     Defendant failed to confirm that there was no lien on the Property, before the loan was approved and funded, to ensure that the Bank had a priority position, with respect to the Property.  Defendant also failed to obtain an updated appraisal when the loan was renewed, to ensure that the collateral provided an adequate source of repayment.

g.      Defendant failed to obtain an appraisal for Borrower A's home, prior to approving or funding the Borrower A Loan I and its renewal, to ensure that the collateral was sufficient to cover this debt, given that the collateral was a junior lien on the borrower's home.

h.     Defendant failed to conduct a title search on Borrower A's home, which would have revealed that the first lien holder, another bank, had filed a default notice on its loan months before MCB's increase of the Borrower A Loan I.

6

      i.      This Grand Island loan was outside the Bank's target trade market area set forth in the Loan Policy.

      j.      Defendant failed to assess the economic environment in which the loan was made.

24.     By approving the Borrower A Loan I, despite the foregoing deficiencies, Defendant violated the Bank's loan policy, as well as prudent, safe, and sound lending practices.

25.     The borrowers defaulted on the Borrower A Loan I.

26.     Plaintiff seeks damages in excess of $1.533 million in connection with Defendant's gross negligence and breaches of fiduciary duty with respect to the Borrower A Loan I.

**Borrower A Loan II**

27.     On September 5, 2008, Defendant approved a $366,000 loan to Borrower A and Shafer Commercial to fund the final development costs for a condominium project located at 1010 Diers, Grand Island, Nebraska (the "Borrower A Loan II"). The Borrower A Loan II was renewed on January 28, 2009, with an additional $160,800 disbursed to the borrower, bringing the total outstanding balance on the loan to $526,800. On July 28, 2009, the Bank funded a $526,800 line of credit to Borrower A and Shafer Commercial to refinance the loan.

28.     There were no guarantors for the Borrower A Loan II. The loan was secured by a second mortgage on Borrower A's home. There were no documents located in the file to identify the primary source of repayment for this loan.

29.     Defendant's approval of the Borrower A Loan II violated the Bank's Loan Policy and safe and sound banking practices, and demonstrated an absence of even slight care in several respects, including, but not limited to, the following:

      a.      Defendant failed to analyze Borrower A and Shafer Commercial's ability to repay the loan.

b.  Defendant failed to obtain tax returns and financial statements for Borrower A or Shafer Commercial

c.  Defendant failed to obtain a credit report for Borrower A.

d.  Defendant failed to perform or require a global cash flow analysis for Borrower A or Shafer Commercial.

e.  Defendant failed to obtain an appraisal for Borrower A's home, prior to approving or funding the Borrower A Loan II, to ensure that the collateral was sufficient to cover this debt.

f.  Defendant failed to conduct a title search on Borrower A's home, which would have revealed that the first lien holder, another bank, had filed a default notice on its loan months before MCB's increase and refinance of the Borrower A Loan II.

g.  This Grand Island loan was outside the Bank's target trade market area set forth in the Loan Policy.

h.  Defendant failed to assess the economic environment in which the loan was made.

30.  By approving the Borrower A Loan II, despite the foregoing deficiencies, Defendant violated the Bank's loan policy, as well as prudent, safe, and sound lending practices.

31.  The borrowers defaulted on the Borrower A Loan II.

32.  Plaintiff seeks damages in excess of $526,800 in connection with Defendant's gross negligence and breaches of fiduciary duty with respect to the Borrower A Loan II.

**Midwest Muffler I**

33.  On March 14, 2008, Defendant approved a $700,800 loan to Borrower A and Midwest Muffler to rewrite and consolidate several loans previously extended to the borrowers and to provide the borrowers with an additional $200,000 in cash for their business (the

8

"Midwest Muffler I Loan").  The purpose of the original loan was to provide the borrowers with cash for Midwest Muffler's business.

34.     The Midwest Muffler I Loan was secured by the inventory, accounts receivable, furniture, fixtures deposit accounts and all assignments and floor plans on automobiles of Midwest Muffler.  No primary or secondary sources of repayment were identified on the loan request form.

35.     Defendant's approval of the Midwest Muffler I Loan violated the Bank's Loan Policy and safe and sound banking practices, and demonstrated an absence of even slight care in several respects, including, but not limited to, the following:

    a.  Defendant failed to analyze Borrower A and Midwest Muffler's ability to repay the loan.

    b.  Defendant failed to obtain tax returns or a credit report for Borrower A.

    c.  Defendant failed to obtain tax returns for Midwest Muffler.

    d.  Defendant failed to perform or require a global cash flow analysis for Borrower A or Midwest Muffler.

    e.  Defendant failed to obtain an appraisal or other collateral valuation to determine the value of Midwest Muffler's assets, or any other analysis performed to determine if these business assets provided adequate security for the loan.

    f.  Defendant failed to confirm that there were no other liens on the collateral securing the Midwest Muffler I Loan.

36.     By approving the Midwest Muffler I Loan, despite the foregoing deficiencies, Defendant violated the Bank's loan policy, as well as prudent, safe, and sound lending practices.

37.     The borrowers defaulted on the Midwest Muffler I Loan.

38.     Plaintiff seeks damages in excess of $668,000 in connection with Defendant's

gross negligence and breaches of fiduciary duty with respect to the Midwest Muffler I Loan.

**Midwest Muffler II**

39.     On January 6, 2010, Defendant approved a $271,000 loan to Borrower A and Midwest Muffler to rewrite loans made in the prior two years to these borrowers (the "Midwest Muffler II Loan"). The purpose of the original loan was to provide the borrowers with cash for Midwest Muffler's business.

40.     The Midwest Muffler II Loan was secured by the inventory, accounts receivable, furniture, fixtures deposit accounts and all assignments and floor plans on automobiles of Midwest Muffler. No primary or secondary sources of income were identified on the loan request form.

41.     Defendant's approval of the Midwest Muffler II Loan violated the Bank's Loan Policy and safe and sound banking practices, and demonstrated an absence of even slight care in several respects, including, but not limited to, the following:

    a.   Defendant failed to analyze Borrower A and Midwest Muffler's ability to repay the loan.

    b.   Defendant failed to obtain tax returns or a credit report for Borrower A.

    c.   Defendant failed to obtain tax returns for Midwest Muffler.

    d.   Defendant failed to perform or require a global cash flow analysis for Borrower A or Midwest Muffler.

    e.   Defendant failed to obtain an appraisal or other collateral valuation to determine the value of Midwest Muffler's assets, or any other analysis performed to determine if these business assets provided adequate security for the loan.

    f.   Defendant failed to confirm that there were no other liens on the collateral securing the Midwest Muffler II Loan.

      g.  Defendant failed to obtain corporate resolutions from Midwest Muffler authorizing the loans in violation of the Loan Policy.

42.     By approving the Midwest Muffler II Loan, despite the foregoing deficiencies, Defendant violated the Bank's loan policy, as well as prudent, safe, and sound lending practices.

43.     The borrowers defaulted on the Midwest Muffler II Loan.

44.     Plaintiff seeks damages in excess of $270,000 in connection with Defendant's gross negligence and breaches of fiduciary duty with respect to the Midwest Muffler II Loan.

**Midwest Muffler III**

45.     On April 24, 2009, Defendant approved a loan in the amount of $326,000 to Borrower A and Midwest Muffler for the purchase of automobiles for Midwest Muffler's business (the "Midwest Muffler III Loan").   Borrower A was the sole guarantor for the loan. The primary source of repayment was income from Midwest Muffler's business.

46.     The loan was secured by the inventory, accounts receivable, furniture, fixtures deposit accounts, and all assignments and floor plans on automobiles of Midwest Muffler.

47.     Defendant's approval of the Midwest Muffler III Loan violated the Bank's Loan Policy and safe and sound banking practices, and demonstrated an absence of even slight care in several respects, including, but not limited to, the following:

      a.  Defendant failed to analyze Borrower A and Midwest Muffler's ability to repay the loan.

      b.  Defendant failed to obtain tax returns or  a credit report for Borrower A.

      c.  Defendant failed to obtain tax returns for Midwest Muffler.

      d.  Defendant failed to perform or require a global cash flow analysis for Borrower A or Midwest Muffler.

      e.  Defendant failed to obtain an appraisal or other collateral valuation to

11

determine the value of Midwest Muffler's assets, or any other analysis performed to determine if these business assets provided adequate security for the loan.

f. Defendant failed to confirm that there were no other liens on the collateral securing the Midwest Muffler III Loan.

48. By approving the Midwest Muffler III Loan, despite the foregoing deficiencies, Defendant violated the Bank's loan policy, as well as prudent, safe, and sound lending practices.

49. The borrowers defaulted on the Midwest Muffler III Loan.

50. Plaintiff seeks damages in excess of $326,000 in connection with Defendant's gross negligence and breaches of fiduciary duty with respect to the Midwest Muffler III Loan.

### Midwest Muffler IV

51. On March 8, 2010, Defendant approved a $100,325 loan to Borrower A and Midwest Muffler (the "Midwest Muffler IV Loan"). The purpose of the loan was to rewrite a previous loan to the borrowers, which provided working capital to Midwest Muffler.

52. The Midwest Muffler IV Loan was secured by the inventory, accounts receivable, furniture, fixtures deposit accounts, and all assignments and floor plans on automobiles of Midwest Muffler. In addition to being a principal borrower, Borrower A was also a guarantor of the Midwest Muffler IV Loan. No primary or secondary sources of repayment were identified on the loan request form.

53. Defendant's approval of the Midwest Muffler IV Loan violated the Bank's Loan Policy and safe and sound banking practices, and demonstrated an absence of even slight care in several respects, including, but not limited to, the following:

a. Defendant failed to analyze Borrower A and Midwest Muffler's ability to repay the loan.

12

b.   Defendant failed to obtain tax returns or a credit report for Borrower A.

c.   Defendant failed to obtain tax returns for Midwest Muffler.

d.   Defendant failed to perform or require a global cash flow analysis for Borrower A or Midwest Muffler.

e.   Defendant failed to obtain an appraisal or other collateral valuation to determine the value of Midwest Muffler's assets, or any other analysis performed to determine if these business assets provided adequate security for the loan.

f.   Defendant failed to confirm that there were no other liens on the collateral securing the Midwest Muffler IV Loan.

g.   Defendant failed to obtain corporate resolutions from Midwest Muffler authorizing the loans in violation of the Loan Policy.

54.   By approving the Midwest Muffler IV Loan, despite the foregoing deficiencies, Defendant violated the Bank's loan policy, as well as prudent, safe, and sound lending practices.

55.   The borrowers defaulted on the Midwest Muffler IV Loan.

56.   Plaintiff seeks damages in excess of $70,000 in connection with Defendant's gross negligence and breaches of fiduciary duty with respect to the Midwest Muffler IV Loan.

**Midwest Muffler V**

57.   On January 7, 2010, Defendant approved a $50,225 loan to Borrower A and Midwest Muffler for additional working capital and to rewrite a previous loan to the borrowers, which also provided working capital (the "Midwest Muffler V Loan"). The purpose of the original loan also was to provide Midwest Muffler with working capital.

58.   The loan was secured by the inventory, accounts receivable, furniture, fixtures deposit accounts, and all assignments and floor plans on automobiles of Midwest Muffler. No primary or secondary sources of repayment were identified on the Loan Request.

59.     Defendant's approval of the Midwest Muffler V Loan violated the Bank's Loan Policy and safe and sound banking practices, and demonstrated an absence of even slight care in several respects, including, but not limited to, the following:

a.   Defendant failed to analyze Borrower A and Midwest Muffler's ability to repay the loan.

b.   Defendant failed to obtain tax returns or a credit report for Borrower A.

c.   Defendant failed to obtain tax returns for Midwest Muffler.

d.   Defendant failed to perform or require a global cash flow analysis for Borrower A or Midwest Muffler.

e.   Defendant failed to obtain an appraisal or other collateral valuation to determine the value of Midwest Muffler's assets, or any other analysis performed to determine if these business assets provided adequate security for the loan.

f.   Defendant failed to confirm that there were no other liens on the collateral securing the Midwest Muffler V Loan.

g.   Defendant failed to obtain corporate resolutions from Midwest Muffler authorizing the loans in violation of the Loan Policy.

60.     By approving the Midwest Muffler V Loan, despite the foregoing deficiencies, Defendant violated the Bank's loan policy, as well as prudent, safe, and sound lending practices.

61.     The borrowers defaulted on the Midwest Muffler V Loan.

62.     Plaintiff seeks damages in excess of $50,000 in connection with Defendant's gross negligence and breaches of fiduciary duty with respect to the Midwest Muffler V Loan.

**Chlonate Loans**

63.     Chlonate, LLC ("Chlonate") was a collection agency in Nebraska started by Borrower B.

14

**Chlonate I**

64.     On October 19, 2008, Defendant approved a $375,600 loan to Chlonate and Borrower B to rewrite a prior loan to the borrowers (the "Chlonate I Loan"). The purpose of the previous loan was to provide Chlonate and Borrower B with funds to remodel property located at 3235 S. Locust, Grand Island, Nebraska (the "Locust Property") and for investment.

65.     The Chlonate I Loan was secured by a Deed of Trust on the Locust Property. No repayment sources were identified on the loan request form.

66.     Defendant failed to get an updated appraisal of the Locust Property.  The last appraisal was more than a year old at the time that the Chlonate I Loan was approved, which violated the Bank's Loan Policy.

67.     Defendant's approval of the Chlonate I Loan violated the Bank's Loan Policy and safe and sound banking practices, and demonstrated an absence of even slight care in several respects, including, but not limited to, the following:

    a.  Defendant failed to analyze Borrower B and Chlonate's ability to repay the loan.

    b.  Defendant failed to obtain tax returns or a credit report for Borrower B.

    c.  Defendant failed to obtain tax returns for Chlonate.

    d.  Defendant failed to perform or require a global cash flow analysis for Borrower B or Chlonate.

    e.  Defendant failed to obtain a current appraisal for the Locust Property.

    f.  This Grand Island loan was outside the Bank's target trade market area set forth in the Loan Policy.

68.     By approving the Chlonate I Loan, despite the foregoing deficiencies, Defendant violated the Bank's loan policy, as well as prudent, safe, and sound lending practices.

69.   The borrowers defaulted on the Chlonate I Loan.

70.   Plaintiff seeks damages in excess of $375,000 in connection with Defendant's gross negligence and breaches of fiduciary duty with respect to the Chlonate I Loan.

### Chlonate II

71.   On January 7, 2010, Defendant approved a $208,375 loan to Chlonate to rewrite a series of earlier loans (the "Chlonate II Loan").   The purpose of the loans was to provide working capital for Chlonate.

72.   Defendant's approval of the Chlonate II Loan violated the Bank's Loan Policy and safe and sound banking practices, and demonstrated an absence of even slight care in several respects, including, but not limited to, the following:

   a.   Defendant failed to analyze Borrower B and Chlonate's ability to repay the loan.

   b.   Defendant failed to obtain tax returns for Chlonate.

   c.   Defendant failed to obtain a tax return or a credit report for Borrower B.

   d.   Defendant failed to perform or require a global cash flow analysis for Chlonate.

   e.   Defendant failed to obtain an appraisal or other valuation of the collateral.

   f.   Defendant failed to obtain corporate resolutions from Chlonate authorizing the loans in violation of the Loan Policy.

73.   By approving the Chlonate II Loan, despite the foregoing deficiencies, Defendant violated the Bank's loan policy, as well as prudent, safe, and sound lending practices.

74.   The borrowers defaulted on the Chlonate II Loan.

75.   Plaintiff seeks damages in excess of $200,000 in connection with Defendant's gross negligence and breaches of fiduciary duty with respect to the Chlonate II Loan.

16

## CLAIMS FOR RELIEF

### COUNT I
### Gross Negligence (12 U.S.C. § 1821(k)) – Approval of Target Loans

76.     The FDIC-R realleges and incorporates by reference the allegations contained in paragraphs 1-75, above, as if fully set forth in this Count.

77.     During all relevant times alleged, Defendant was an officer and a director of MCB.

78.     Section 1821(k) of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") holds directors and officers of financial institutions personally liable for loss or damage to the institution caused by their "gross negligence," as defined by applicable state law.   Nebraska law defines gross negligence as the absence of slight care in the performance of one's duties.

79.     As an officer and director of MCB, Defendant owed a duty to the Bank to carry out his responsibility by exercising the degree of care, skill, and diligence that ordinarily prudent persons in like positions would use under similar circumstances.   These duties included, but were not limited to, the following:

    a.     To manage, conduct, and direct the business and affairs of MCB in accordance with and to ensure compliance with applicable laws, regulations, bylaws, Bank policies, and sound and prudent banking practices;

    b.     To actively review and approve or disapprove each loan;

    c.     To take such action as necessary to ensure that MCB's loans were underwritten, approved, disbursed, and collected in accordance with the law, regulations, bylaws and Bank policies applicable thereto and in accordance with sound and prudent banking practices;

    d.     To exercise independent judgment in the best interests of MCB in the conduct of its business and affairs; and

    e.     To ensure that MCB did not engage in any unsafe or unsound practices.

80.     Defendant breached his duties and was grossly negligent by, *inter alia*, approving the Target Loans described above, in violation of the Bank's loan policy and prudent, safe, and sound lending practices, and by:

a.      Failing to obtain borrower and guarantor financial information;

b.      Failing to perform and/or ensure that global cash flow analyses were performed at loan approval;

c.      Failing to properly assess the repayment ability of borrowers and/or guarantors;

d.      Extending credit outside the Bank's normal trade area;

e.      Relying on outdated, unverified, and/or inadequate financial information for borrowers and guarantors;

f.      Failing to obtain corporate resolutions for entity borrowers authorizing the loans;

g.      Failing to obtain appraisals or other collateral valuations prior to loan origination.

h.      Failing to obtain necessary financial information and documentation for borrowers and guarantors; and

i.      Failing to document underwriting and due diligence.

j.      Failing to conduct any analysis on the creditworthiness of the borrower or the purpose of the loan.

81.     Defendant's conduct constitutes great and excessive negligence and the absence of slight care in the performance of his duties.

82.     As a direct and proximate result of Defendant's gross negligence, the FDIC-R suffered damages in an amount to be determined at trial, now believed to be in excess of $4.018 million.

WHEREFORE, Plaintiff Federal Deposit Insurance Corporation as Receiver for Mid City Bank, Inc. demands trial by jury and judgment in its favor and against Defendant James G. Fitl

in an amount to be determined at trial, for prejudgment interest, for its costs, and for such other and further relief as the Court deems just and proper.

## COUNT II
### Breach of Fiduciary Duty (Nebraska law) – Approval of Target Loans

83.     The FDIC-R realleges and incorporates by reference the allegations contained in paragraphs 1-75, above, as if fully set forth in this Count.

84.     Defendant owed MCB fiduciary duties to exercise the highest degree of loyalty, care, diligence, and fair dealing in the management, conduct, and direction of the business of MCB.  These duties included, but were not limited to, the following:

   a.     To manage, conduct, and direct the business and affairs of MCB in accordance with and to ensure compliance with applicable laws, regulations, bylaws, Bank policies, and sound and prudent banking practices;

   b.     To actively review and approve or disapprove each loan;

   c.     To take such action as necessary to ensure that MCB's loans were underwritten, approved, disbursed, and collected in accordance with the law, regulations, bylaws and Bank policies applicable thereto and in accordance with sound and prudent banking practices;

   d.     To exercise independent judgment in the best interests of MCB in the conduct of its business and affairs; and

   e.     To ensure that MCB did not engage in any unsafe or unsound practices.

85.     Defendant breached his fiduciary duties by, *inter alia*, approving the Target Loans described above, in violation of the Bank's loan policy and prudent, safe, and sound lending practices, and by:

   a.     Failing to obtain borrower and guarantor financial information;

   b.     Failing to perform and/or ensure that global cash flow analyses were performed at loan approval;

   c.     Failing to properly assess the repayment ability of borrowers and/or guarantors;

d.      Extending credit outside the Bank's normal trade area;

e.      Relying on outdated, unverified, and/or inadequate financial information for borrowers and guarantors;

f.      Failing to obtain corporate resolutions for entity borrowers authorizing the loans;

g.      Failing to obtain appraisals or other collateral valuations prior to loan origination.

h.      Failing to obtain necessary financial information and documentation for borrowers and guarantors; and

i.      Failing to document underwriting and due diligence.

j.      Failing to conduct any analysis on the creditworthiness of the borrower or the purpose of the loan.

86.     As a direct and proximate result of Defendant's breach of his fiduciary duties, the FDIC-R suffered damages in an amount to be determined at trial, now believed to be in excess of $4.018 million.

WHEREFORE, Plaintiff Federal Deposit Insurance Corporation as Receiver for Mid City Bank, Inc. demands trial by jury and judgment in its favor and against Defendant James G. Fitl in an amount to be determined at trial, for prejudgment interest, for its costs, and for such other and further relief as the Court deems just and proper.

DATED:            November 3, 2014

/s/  Michael L. Johnson
Michael L. Johnson (#10590)
Tanya J. Hansen (#23306)
Leininger, Smith, Johnson, Baack, Placzek & Allen
104 N. Wheeler St.
Grand Island, NE  68802
Telephone:  (308) 382-1930
Fax:  (308) 382-5521
E-mail: mjohnson@gilawfirm.com
E-mail: thansen@gilawfirm.com


Randall D. Lehner (#6237535) (*pro hac vice* pending)
Givonna L. Long (#6290076) (*pro hac vice* pending)
Ulmer & Berne LLP
500 W. Madison, Suite 3600
Chicago, IL 60661
Telephone: (312) 658-6500
Fax (312) 658-6501
E-mail: rlehner@ulmer.com
E-mail: glong@ulmer.com

*Attorneys for Plaintiff*